## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **CELIA CUNNINGHAM KAVANAUGH,** | : | |
| | : | **Case No. 2:15-CV-2846** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

Plaintiff, Celia Cunningham Kavanaugh, brings this action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security disability insurance benefits. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 14); the Commissioner's Memorandum in Opposition (ECF No. 19); Plaintiff's Reply (ECF No. 20); and the administrative record. (ECF No. 9.) For the following reasons, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff filed an application for benefits on August 6, 2012, alleging that she has been disabled since January 1, 2011 due to loss of strength in her arms and legs, depression, a back injury, arthritis, pelvic pain, back pain, a neck injury, and fibromyalgia. (R. at 164–65, 185.) Plaintiff's application was denied initially and upon reconsideration. (R. at 114–17, 121–27.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 128–29.) A hearing was held by Administrative Law Judge Edmund E. Giorgione ("ALJ") on May 19, 2014, at

1

which Plaintiff was represented by counsel.  (R. at 49–74.)  On July 15, 2014, the ALJ issued a

decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(R. at 15–38.)  On August 12, 2015, the Appeals Council denied Plaintiff's request for review

and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then

timely commenced this action.

### A.  Plaintiff's Testimony

At the May 19, 2014 hearing, Plaintiff testified that she lived alone in a two-story house.

(R. at 49.)  She has a bachelor's degree and has completed work towards a master's degree.  (*Id.*)

She stated that she last worked in 2011 and that her children were providing her with funds to

pay bills.  (R. at 50.)  Plaintiff explained that sometimes she cannot work because of "confusion"

and because pain, including back pain, forces her to lie down and prevents her from finishing

tasks. (R. at 52.)  Plaintiff estimated that during an eight-hour work day, she needed to lie down

about two or three times for about 15 or 20 minutes at a time.  (R. at 52, 54.)  She explained that

"cardiac stuff" interfered with how far she can walk more than her back pain does.  (R. at 53.)

Plaintiff testified that she is short of breath after walking 100 yards and sometimes needs to stop

walking up the stairs in her house.  (R. at 54.)  She also described issues with problem solving,

weakness, and feeling weary.  (R. at 52.)

Plaintiff testified that she did not watch television but could get on her computer for 30 to

40 minutes to check email, read news, play games, and use social media before pain in her pelvic

floor and numbness in her feet forced her to lie down or move around.  (R. at 55, 60.)  Plaintiff

described her pain as "taking a wedge and [ ] splitting the left side of the pelvis from the

tailbone" and noted that it felt like "somebody has hooked a fish hook in the left side of the

vagina . . . and is twisting it."  (R. at 59.)  Plaintiff also described pain in the inside of the back of

2

her pelvis, neck and shoulder pain, and arthritis pains in her joints of her thumb and elbow. (*Id.*) Plaintiff testified that a hysterectomy had given her better bladder control "but it has not helped with the other pain." (R. at 60.) She explained that arrhythmia caused her to experience confusion, lightheadedness, sweating, weakness, faintness, and stumbling. (R. at 63.) She stated that when she experiences these symptoms, she "check[s] the numbers" and lies down. (*Id.*) Plaintiff also stated that she sometimes has difficulty sitting, and that depending on the chair, she can sit from 20 to 30 minutes or in some cases 45 to 60 minutes. (R. at 64.)

Plaintiff testified that she enjoys reading, although she reads more slowly than she used to. (R. at 55.) Plaintiff stated that she could shower, bathe, and dress herself although she has struggled with putting on socks and shoes a couple times. (*Id.*) Plaintiff acknowledged having a driver's license and stated that she drove the Friday before the hearing. (R. at 55-56.) Plaintiff asserted, however, that she had pain when driving and sometimes felt lightheaded or disoriented. (R. at 56.) Plaintiff explained that she does cooking, dishes, and laundry, but a friend helps her with vacuuming, mopping, and changing bed linens. (*Id.*) She stated that rarely cooks a whole meal without breaks and that although she goes grocery shopping, she either brings someone with her or asks an employee to help her put heavy items in her cart. (R. at 65-66.) Plaintiff stated that she realized that she had become disabled in January of 2011 when reviewing her client calendar for the year. She testified that she noticed then that she had only been able to work two to three billable hours in a day. (R. at 60-61.) Plaintiff also testified that she did not have the energy and focus to work properly. (*Id.*)

3

**B.    Medical Records[1]**

*1.  Plaintiff's Cardiological Issues*

a.  <u>Robert Zaino, M.D. at Generations Family Medicine</u>

Plaintiff began treatment with a primary care physician, Dr. Robert Zaino, at Generations

Family Medicine ("Generations") in February of 2010.  (R. at 248-98.)  Medical records from

Generations indicate that when Plaintiff sought treatment for respiratory illnesses in January and

March of 2011, as well as a dog bite in August of 2011, she had a regular heart rate and rhythm.

(R. at 283, 280, 278, 273.)  Treatment notes from a visit for a sinus infection in December of

2011 state that a physical examination revealed an irregular heart beat and that Dr. Zaino

recommended an EKG.  (R. at 269.)  The same notes indicate that Plaintiff also reported

occasionally feeling an irregular heart beat and experiencing episodes of dizziness but that the

dizziness was very brief and not "enough" to make Plaintiff feel like she might fall.  (R. at 269.)

The records from an examination in January of 2012 for a sinus infection state that Plaintiff

believed that grief over the death of a pet and use of prednisone were possibly causing her to

experience heart palpitations.  (R. at 266.)

b.    <u>Mount Carmel St. Ann's</u>

On January 13, 2013, Plaintiff visited the emergency room.  (R. at 331.)  The medical

records indicate that Plaintiff reported experiencing chest discomfort while doing physical

therapy exercises.  (*Id.*)  She was given aspirin and nitroglycerin and underwent a chest X-ray

and an EKG.  (R. at 331, 341.)  The X-ray revealed mild degenerative changes of the spine, but

---

[1]Plaintiff's assertions of error in the ALJ's decision relate to her physical rather than mental
limitations.  (ECF No. 9.)  Consequently, a detailed description of her mental impairment is
unnecessary.

4

no acute infiltrate of the lungs.  (*Id.*)  The EKG revealed sinus bradycardia with premature atrial complexes, possible left atrial enlargement, and borderline ECG.  (R. at 348.)

c.  Ohio Health Heart and Vascular Physicians Nicholas Davakis, M.D. and Seth Rials, M.D.

On January 23, 2013, Plaintiff was evaluated by cardiologist Nicholas Davakis, M.D.  (R. at 350-51.)  In a letter dated that day, Dr. Davakis wrote that Plaintiff complained of non-cardiac issues including low back and pelvic pain, persistent fatigue, and decreased exercise tolerance, but she denied any recent syncopal or near syncopal episodes, any signs or symptoms of heart failure, or chest pain.  (R. at 350.)  The letter states that Plaintiff did, however, complain of "atypical chest discomfort" that occurred when resting and with exertion but that it did not appear to be ischemic.  (*Id.*)  The letter also states that Plaintiff's cardiac examination was remarkable for a normal S1 and S2 with a very soft mid-systolic murmur at the lower left sternal border with no gallops or other abnormal sounds.  (*Id.*)  Her abdomen was thin and nontender without bruits and she had excellent pulses and no peripheral edema.  (*Id.*)  Her resting electrocardiogram demonstrated normal sinus rhythm with no acute abnormalities.  (*Id.*)  Dr. Davakis arranged for her to have an echocardiogram on January 30, 2013. (R. at 351.)

The echocardiogram revealed low normal systolic global ejection fraction; abnormal left ventricle diastolic filing consistent with impaired LV relaxation; moderate mitral valve prolapse; mild to moderate mitral regurgitation; and mild to moderate tricuspid regurgitation.  (R. at 353.) A stress test performed that same day revealed no ischemic changes with exercise, frequent premature atrial contractions ("PAC"), and occasional premature ventricular contractions ("PVC").  (R. at 352.)

On April 10, 2013, Dr. Davakis wrote that Plaintiff complained of daily palpitations.  (R. 496.)  He prescribed a Holter monitor.  (*Id.*)  Dr. Seth Rials, M.D., a cardiologist, assessed the

Holter monitor on April 18, 2013, and documented frequent PACs, occasional PVCs, and 244 episodes of supraventricular tachycardia ("SVT").  (R. at 497.)  There were, however, no episodes of ventricular tachycardia.  (*Id.*)

Notes indicate that on May 1, 2013, Plaintiff reported that she continued to experience palpitations and intermittent dyspnea, particularly when climbing stairs.  (R. at 495.)  Dr. Rials adjusted Plaintiff's medication and dosage.  (R. at 495.)  After an examination on May 24, 2013, Dr. Rials wrote that attempts to suppress Plaintiff's arrhythmia with medications had been ineffective.  (R. at 494.)  Dr. Rials wrote that he reassured Plaintiff that the bulk of her symptoms were not related to her arrhythmia and could be medication induced.  (*Id.*)  Dr. Rials noted that he discontinued the Caredilol and Diltiazem and prescribed Propafenone, with the hope of providing "more specific arrhythmia control."  (*Id.*)  Dr. Rials wrote that he spent considerable time explaining the nature of Plaintiff's arrhythmia and its apparent lack of coordination with Plaintiff's symptoms.  (*Id.*)

Medical records from Riverside Methodist Hospital confirm that Plaintiff went to the emergency room on June 22, 2013 with complaints of palpitations and hypertension.  (R. at 465−83.)  After EKGs showed both SVT and an atrial flutter, Plaintiff was admitted.  (*Id.*)  A carotid duplex documented 20-39% stenosis of the left and right internal carotid arteries.  (R. at 484.)  An X-ray of the chest showed no active disease in the chest.  (R. at 475.)  After stabilizing her rhythm, Plaintiff was discharged on June 25, 2013 and instructed to follow-up with Dr. Rials.  (R. at 483.)

Notes dated July 3, 2013 indicate that Plaintiff reported that her medication had been changed by the doctors at Riverside Methodist Hospital and that she had noticed improvements in her arrhythmia after those changes.  (R. at 493.)  The notes further state that Plaintiff reported

6

experiencing an occasional irregular heartbeat, some dyspnea, and rare and short lived shooting chest discomfort.  (*Id.*)  Plaintiff remained on the medication Betapace.  (*Id.*)  A July 24, 2013 X-ray of the chest revealed that Plaintiff's heart size and mediastinum were normal although increased markings and hyperaeration of the lungs were consistent with chronic obstructive pulmonary disease ("COPD").  (R. at 487.)  There was no acute infiltrate.  (*Id.*)  On August 5, 2013, Dr. Rials evaluated Plaintiff for preoperative cardiac risk prior to undergoing a hysterectomy.  (R. at 490-91.)  Dr. Rials wrote that Plaintiff's arrhythmia had improved.  (R. at 490-91.)  A September 2013 Holter monitor documented frequent PACs and 36 episodes of SVT, but no ventricular tachycardia.  (R. at 727.)  Dr. Rial's notes from November 4, 2013 state that Plaintiff reported that she continued to experience occasional palpitations as well as back and pelvic pain.  (R. at 726.)  Dr. Rials continued to prescribe the medication Sotalol and recommended that Plaintiff follow up with him in six months.  (R. at 726.)

On March 11, 2014, Plaintiff was hospitalized overnight at Grant Medical Center on for atrial fibrillation with a heart rate of 138 on admission.  (R. at 781−805.)  Plaintiff underwent a transthoracic echocardiogram which showed an estimated left ventricular ejection fraction of 45%.  (R. at 802.)  Plaintiff was discharged with an increased dose of Sotalol.  (R. at 790.)  On March 31, 2014, Dr. Rials wrote that Plaintiff reported almost daily episodes of arrhythmia, that Sotalol had not provided her with significant arrhythmia relief, and that he discussed various treatment options with her.  (R. at 840.)

### b.  *Plaintiff's Other Physical Issues*

### a.  Dr. Zaino, M.D. at Generations Family Medicine

The medical records reflect that Plaintiff sought treatment from Dr. Zaino for acute lower back pain in May of 2012 that arose after she moved 40-pound bags of mulch.  (R. at 259−60.)

A May 11, 2012 X-ray of her lumbar spine showed mild L1-L2 degenerative disc disease with additional multilevel facet arthropathy.  (R. at 286.)  An X-ray of the pelvis taken that same day showed mild osteoarthritis of the hips.  (R. at 287.)  An MRI of Plaintiff's lumbar spine on May 23, 2012 documented L4-L5 disc displacement with superimposed left pre-foraminal and foraminal disc-osteophyte complex; facet arthropathy with mild left foraminal narrowing and abutment of the left L4 nerve root; L3-L4 protruding disc more prominent in the left foramen with mild left foraminal narrowing; and superimposed three-millimeter right paracentral non-neurocompressive herniated nucleus pulposus.  (R. at 239-40.)

Dr. Zaino's June 17, 2012 treatment notes state that Plaintiff reported lower pelvic discomfort, vaginal itchiness, and pain when sitting, and that Plaintiff suspected her uterus or vagina might be prolapsed.  (R. at 252.)  During an examination on June 17, 2012, Plaintiff's muscle tone and strength were normal and she had a positive toe and heel walk, but she exhibited a negative straight leg raise and decreased lumbar range of motion.  (R. at 254-55.)

Dr. Zaino asked Dr. Reynolds, a rehabilitation specialist, to evaluate Plaintiff.  (R. at 242.)  Dr. Reynolds wrote a letter on June 18, 2012, that stated that his impression was that Plaintiff had a "lumbosacral strain/sprain and a lot of this sounds musculoskeletal in nature with a history of fibromyalgia."  (R. at 245.)  Dr. Reynolds also wrote that he was concerned about Plaintiff's reported episodes of right foot-drop and a reported episode of sudden blindness in April 2008.  (R. at 245, 241.)

b.  Michael Meagher, M.D. and Geoffrey Eubank, M.D. at Neurological Associates, Inc.

Plaintiff was examined by Dr. Michael Meagher, a neurosurgeon, in August of 2012, because she complained of pain in her tailbone, pelvis, and left leg.  (R. at 319.)  Dr. Meagher wrote that his examination revealed that Plaintiff's motor strength in the upper and lower

extremities was normal and that Plaintiff was able to get on her heels and toes and did not have

any apparent foot drop.  (R. at 320.)  Dr. Meagher also wrote that Plaintiff had some stocking

distribution sensory changes to pinprick, lacked vibratory sensation in both feet, and had mildly

abnormal temperature sensation in the right calf.  (R. at 320.)  Vibratory sensations in her hands

appeared to be normal on the right side.  (*Id.*)  Dr. Meagher ordered an MRI of Plaintiff's pelvis

and recommended that she follow up with Dr. Geoffrey Eubank, a neurologist.  (R. at 320.)  An

August 23, 2012 MRI of Plaintiff's pelvis showed no acute osseous or muscular abnormalities.

(R. at 288.)  The medical records indicate that although the MRI was not tailored for an

evaluation of pelvic organs, there was no evidence of acute intrapelvic abnormality.  (*Id*.)

Plaintiff saw Dr. Eubank on September 24, 2012.  (R. at 316-17.)  Dr. Eubank wrote that

an EMG/nerve conduction study of Plaintiff's legs showed no evidence for peripheral

neuropathy or radiculopathy.  (R. at 316.)  Dr. Eubank did not have a definitive explanation for

Plaintiff's back, pelvis and leg pain so he ordered an MRI of the cervical spine.  (R. at 317.)  The

MRI of the cervical spine revealed mild foraminal narrowing on the right at C3-C4 due to facet

hypertrophy, mild right facet arthropathy at C4-C6, and no evidence of central spinal canal

stenosis.  (R. at 301-02.)  On October 1, 2012, Dr. Meagher wrote that he reviewed the cervical

MRI ordered by Dr. Eubank, and noted that he did not have a neurosurgical explanation for

Plaintiff's symptoms.  (R. at 315.)  Dr. Meagher also wrote that either ilioinguinal or

iliohypogastric nerve could be possible causes of Plaintiff's pelvic pain.  (*Id*.)  Dr. Meagher

referred Plaintiff to a pain management specialist, Dr. Reddy, who opined that Plaintiff probably

suffered from pudendal nerve pain and recommended that she find a gynecologist or obstetrician

who specialized in pelvic pain.  (R. at 315, 313-14.)

9

c.  Physical Therapy for Pelvic Pain Rehabilitation

 Plaintiff's primary care physician, Dr. Zaino, referred Plaintiff to a physical therapist

("PT") for pelvic pain rehabilitation in December of 2012.  (R. at 580.)  On March 8, 2013, the

PT wrote that after 12 visits, the therapy had not improved Plaintiff's symptoms and that she

recommended discontinuing Plaintiff's physical therapy.  (R. at 578.)  On June 3, 2013, the PT

wrote that Plaintiff had completed four additional sessions and a review of her home exercise

program.  (R. at 576.)  The PT wrote that she hoped a home program would improve Plaintiff's

condition.  (R. at 578.)

d.  Joseph Novi, D.O., Urogynecologist

On May 2, 2013, Plaintiff sought treatment from Dr. Joseph Novi, an urogynecologist.

(R. at 563.)  Dr. Novi wrote that Plaintiff reported difficulty passing stools and that she

experienced stress urinary incontinence and urge urinary incontinence. (R. at 533.)  Dr. Novi also

noted two ulcerative lesions on Plaintiff's vulva.  (R. at 536.)  Because of the lesions, Dr. Novi

referred Plaintiff to Riverside OB/GYN Community Care for a colposcopic examination of her

cervix, vagina, and vulva.  (R. at 551.)  The medical records indicate that the results of the

colposcopic examination were abnormal, and that Plaintiff was told she needed to receive laser

treatments or a vulvectomy to prevent the lesions from progressing to cancer.  (R. at 552.)

On June 3, 2013, Dr. Novi wrote that he performed urodynamic bladder testing on

Plaintiff and found that she had stress urinary incontinence with urethral hypermobility and

intrinsic sphincter deficiency.  (R. at 515.)   Dr. Novi's notes state that he diagnosed Plaintiff

with chronic pelvic pain; urinary retention possibly secondary to advanced prolapse;

symptomatic stage III cystocele; stage II uterine prolapse with vaginal vault prolapse; and vulvar

lesions.  (R. at 518.)  On August 21, 2013, Plaintiff received a total abdominal hysterectomy with

10

bilateral salpingo-oophorectomy, abdominal sacralcolpopexy, suburethral sling, perineorrhaphy, and a vulvectomy.  (R. at 512, 633−36, 502.)  A pathology report examining the vulvar excision noted that the removed tissue was a high grade squamous intraepithelial lesion.  (R. at 570.)

On October 25, 2013, Plaintiff returned to Riverside OB/GYN Community Care with complaints of labial irritation.  (R. at 700.)  Doctors performed a vulvar colposcopy and biopsies.  (R. at 709.)  A pathology report dated October 26, 2013 stated that Plaintiff was diagnosed with carcinoma in situ vulva.  (R. at 704.)  In an October 29, 2013 letter, Riverside OB/GYN recommended that Plaintiff undergo C02 laser treatment after the biopsy site healed.  (R. at 696.)  The records reflect that Plaintiff received that laser treatment on December 11, 2013.  (R. at 691, 733−38.)

On December 2, 2013, Dr. Novi wrote that he had a follow up visit with Plaintiff prior to her laser treatment.  (R. at 841−42.)   Plaintiff reported difficulty with bowel movements.  (*Id.*)  Dr. Novi examined Plaintiff and opined that she had a stage one rectocele.  (*Id.*)  Dr. Novi referred Plaintiff to a colorectal surgeon for a consultative examination.  (*Id.*)

### e.  Peter Lee, M.D. at Colon Rectal Centers

On December 18, 2013, January 15, 2014, and February 26, 2014, Plaintiff was examined by Dr. Peter Lee.  (R. at 711−24).  Dr. Lee's records reflect that Plaintiff reported random and mild symptoms of incomplete defecation.  (R. at 720, 715, 711.)  Dr. Lee wrote that an MR defecography showed perineal descent and obstructed defecation but no evidence of a rectal prolapse or internal intussusception of the rectum.  (R. at 722, 716, 713.)  Dr. Lee wrote that he would follow up with Dr. Novi and that he recommended that Plaintiff continue using laxatives.  (*Id.*)

### C.     State Agency Evaluation

On October 10, 2012, state agency physician, William Bolz, D.O., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 82-92.) Dr. Bolz opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday. (R. at 91.) Dr. Bolz found that Plaintiff was limited in push and/or pull in her lower extremities. (*Id.*) According to Dr. Bolz, Plaintiff could frequently climb ramps and stairs and occasionally climb ladders, ropes, or scaffolds, and stoop, kneel, crawl, or crouch. (*Id.*) Dr. Bolz found Plaintiff only partially credible, noting that she alleged loss of strength in her arms and legs while examinations in June and August of 2012 showed normal strength. (R. at 90.) Gerald Klyop, M.D. reviewed Plaintiff's records upon reconsideration on March 21, 2013. (R. at 96−112.) Dr. Klyop generally affirmed Dr. Bolz's assessment except that Dr. Klyop opined that Plaintiff would also be limited to occasional use of foot controls noting: "[degenerative disc disease] of C-spine and L-spine; mild narrowing of both hips; paraesthesias in legs; no focal neuro deficits; gait [within normal limits]; breath sounds slightly diminished, possible COPD; history of fibromyalgia and lumbar strain; has some stocking distribution sensory to pinprick and absent vibratory sensation [bilateral] feet." (R. at 108.)

### D.     Vocational Expert Testimony

Vocational expert, Michael A. Klein, Ph.D. ("VE"), testified at the May 19, 2014 hearing. (R. at 74-80.) The VE classified Plaintiff's past relevant work as a contractor as a light, skilled position; a carpenter as a medium, skilled position; an administrative assistant/office manager as a sedentary, skilled position; and a tax preparer as a sedentary, semi-skilled position.

12

(R. at 75.)  The ALJ asked the VE if a hypothetical person with Plaintiff's age, education, experience, and the following restrictions could perform Plaintiff's past work:

> [t]his individual could lift and carry 20 pounds occasionally, ten pounds frequently . . . [s]tand and walk six hours out of an eight hour workday . . . [s]it six hours out of an eight hour workday . . . [t]his individual could only operate bilateral foot controls occasionally  . . . [t]his individual could *frequently* climb ramps and stairs, balance, kneel, crouch, and crawl . . . [c]ould occasionally climb ladders ropes, and scaffolds . . .  [a]nd should avoid concentrated exposure to hazards such as unprotected machines and unprotected heights . . . plus this individual would be limited to simple, repetitive, tasks with no strict time or production demands, and have only occasionally superficial contact with supervisors, coworkers, and the general public.

(R. at 75−77.)  (emphasis added.)  The VE testified that the hypothetical individual could not perform Plaintiff's past work, but could perform the light, unskilled job of retail labeler/marker, or the light, unskilled job of cleaner.  (R. at 76−77.)  The VE further testified that significant numbers of both positions exist in the local and national economy, specifically 4,000 cleaning jobs in the state and 194,000 nationally as well as 7,000 retail labeler/marker jobs in the state and 210,000 nationally.  (*Id.*)

## E.    The Administrative Decision

On July 15, 2014, the ALJ issued his decision.  (R. at 15–38.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31,

2016. (R. at 20.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff

had not engaged in substantial gainful activity since her alleged onset date of January 1, 2011.

(*Id.*) The ALJ also found that Plaintiff had the severe impairments of coronary artery disease

("CAD"), degenerative changes of the cervical and lumbar spine and hips, and an affective

disorder. (*Id.*) The ALJ determined that Plaintiff's "chronic obstructive pulmonary disease

("COPD") . . . a history of squamous lesion of the left vulva, for which she underwent surgical

intervention in August and December 2013 . . . *and related symptoms* . . . are not severe

individually or in combination within the meaning of the regulations." (R. at 21.) (emphasis

added.) The ALJ further determined that Plaintiff's fibromyalgia was not a medically

determinable impairment. (R. at 22.) Moreover, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically comparing her

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

impairments against Listings 1.02A (disorders of the lower extremities), 1.04 (disorder of the spine), and 4.02 - 4.12 (cardiovascular). (R. at 22-23.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

I find that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and can lift, carry, push and pull up to 20 pounds occasionally and up to 10 pounds frequently. She can sit for up to 6 hours in an 8-hour workday. She can stand and walk for up to 6 hours in an 8-hour workday. Bilateral operation of foot controls is limited to no more than occasionally. Balancing, climbing ramps and stairs, crawling, crouching and kneeling are each limited to no more than *occasionally*. Climbing ladders, ropes and scaffolds is limited to no more than *occasionally*. She is limited to less than concentrated exposure to hazards such as unprotected heights and machinery. Mentally, the [Plaintiff] retains the capacity to perform simple repetitive routine tasks involving no strict time or production demands and no more than occasional superficial contact with co-workers, supervisors and the general public.

(*Id.*) (emphasis added.) The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms not credible to the extent they were inconsistent with the above residual functional capacity assessment. (R. at 29.) The ALJ also gave due consideration to Plaintiff's daily cigarette smoking in assessing her residual functional capacity. (R. at 31.) The ALJ gave "great" weight to the opinions of the state agency reviewing physicians, Drs. Bolz and Klyop. (R. at 32.) In addition, the ALJ noted the general lack of objective evidence to support Plaintiff's subjective complaints. (R. at 34.) Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform light, unskilled jobs that exist in significant numbers in the national economy. (R. at 36.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 38.)

## II. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

15

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

### III.   ANALYSIS

Plaintiff asserts that the ALJ erred at step two of the sequential analysis because he failed

to consider all of Plaintiff's alleged impairments and the severity of each when formulating

Plaintiff's RFC. (ECF No. 14, PAGEID # 931.) Plaintiff also asserts that the ALJ erred at step

16

five because the hypothetical he posed to the VE failed to fully account for Plaintiff's limitations. (ECF No. 14, PAGEID # 12.)

### A.    The ALJ Did Not Commit Reversible Error at Step Two of the Analysis

Plaintiff asserts that the ALJ erred by failing to consider the following alleged severe impairments: "frequent premature atrial contractions (PACs), atrial fibrillation, moderate mitral valve prolapse with mild to moderate regurgitation . . . , chronic pelvic pain, status post total abdominal hysterectomy . . . , urinary incontinence . . . , and rectal prolapse." (ECF No. 14, PAGEID # 931.)  The Court disagrees.

When an ALJ determines that a claimant has a severe impairment at step two of the analysis "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2013).  Instead, the pertinent question is whether the ALJ considered the limiting effects of all [claimant's impairments], even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. §404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred in finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987) (same).

In this case, the ALJ considered all of Plaintiff's alleged impairments.  First, the ALJ determined that Plaintiff had a number of severe impairments, including coronary artery disease. (R. at 20.)  When determining that Plaintiff's coronary artery disease did not meet or equal a listing, the ALJ cited specific treatment records discussing Plaintiff's EKG results, atrial tachycardia, mitral valve prolapse, hypertension, and arrhythmia.  (R. at 23.)  When formulating

17

Plaintiff's RFC at step three of the analysis, the ALJ also cited a multitude of Plaintiff's cardiac symptoms: "[Plaintiff] experiences atrial fibrillation, hypertension, mitral valve prolapse and supra ventricular tachycardia and alleges chest pain, dizziness and shortness of breath . . . ." (R. at 29.)  The ALJ also wrote that when he formulated the RFC, he considered the entire record. (R. at 29.)  In sum, the Court concludes that the ALJ considered the limiting effects of Plaintiff's cardiac conditions.

The ALJ also considered Plaintiff's "chronic pelvic pain, status post total abdominal hysterectomy . . . urinary incontinence . . . and rectal prolapse." (ECF No. 14, PAGEID # 931.) At step two, the ALJ specifically found that Plaintiff's "history of squamous lesion of the left vulva, for which she underwent surgical intervention in August and December of 2013, *and related symptoms*" were not severe impairments. (R. at 21.) (emphasis added.)  Notably, Plaintiff's August 2013 surgery was a combined hysterectomy and vulvectomy. (R. at 512, 633−36, 502.)  When determining that these impairments were not severe, the ALJ cited treatment records discussing Plaintiff's pelvic pain, her upcoming "surgical intervention for pelvic prolapse," bladder testing, and her vulvectomy. (R. at 21.)  In addition, when formulating Plaintiff's RFC at step three of the analysis, the ALJ also specifically wrote that Plaintiff "repeatedly denied bladder and bowel incontinence" and cited treatment records discussing Plaintiff's pelvic pain, suspected pelvic prolapse, and urinary incontinence. (R. at 30.)  Plaintiff also sought treatment from her urogynecologist, Dr. Novi, for bowel issues and Dr. Novi referred her for a consultation to Dr. Lee, a colorectal surgeon, who found no evidence of a rectal prolapse. (R. at 841−42.)  In sum, the Court concludes that the ALJ considered Plaintiff's gynecological and related issues.

18

Moreover, the RFC formulated by the ALJ indicated that Plaintiff was limited to light work with restrictions. (R. at 28−29.) Plaintiff does not point to any additional restrictions that would have been included in the RFC had the ALJ more specifically listed these alleged severe impairments in his written determination. None of Plaintiff's treatment providers opined that these conditions created any functional limitations for Plaintiff. Thus, this assignment of error is not well taken.

### B.      The ALJ Did Not Commit Reversible Error at Step Five of the Analysis

Plaintiff asserts, and the Commissioner concedes, that the hypothetical that the ALJ presented to the VE failed to include all of Plaintiff's limitations. Specifically, at step four of the analysis, the ALJ determined that Plaintiff could only *occasionally* climb ramps and stairs, balance, kneel, crouch, and crawl. (R. at 28−29.) In a hypothetical posed to the VE, the ALJ asked the VE to consider someone who could *frequently* climb ramps and stairs, balance, kneel, crouch, and crawl. (R. at 76.) The Commissioner argues, and the Court agrees, that this failure does not constitute reversible error.

When discussing a hypothetical posed by an ALJ to a VE, the Sixth Circuit has explained as follows:

> [w]hen the Commissioner seeks to rely on the testimony of the [vocational expert] to show the existence of a substantial number of jobs other than past work that the claimant can perform, the testimony must have been given in response to a hypothetical question that accurately portrays the claimant's physical and mental impairments. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513, 516 (6th Cir. 2010). An improper hypothetical cannot serve as substantial evidence. *Id.* Nevertheless, hypothetical questions must incorporate only the limitations that the ALJ has accepted as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

*Smith–Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014); *see also Keeton*

19

*v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 533 (6th Cir. 2014).  Essentially, the hypothetical question posed to the vocational expert must include an accurate calculation of the claimant's residual functional capacity—i.e., "a description of what the claimant 'can and cannot do.'" *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 453 (6th Cir. 2007) (quoting *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004)).

In this case, the ALJ's did rely upon the vocational expert's testimony in making the step-five determination.  The ALJ wrote:

> [i]f [Plaintiff] has the residual functional capacity to perform the full range of light work, Medical–Vocational Rule 202.18 directs a finding of "not disabled." However, [Plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by her exertional, postural, and mental limitations. To determine the extent to which [Plaintiff's] limitations erode the unskilled light occupational base, the [VE] was asked whether jobs exist in the State of Ohio and the United States for an individual with [Plaintiff's] age, education, work experience and residual functional capacity from the alleged onset date of disability through the date last insured. [The VE] testified that given all of these factors, such an individual could perform the following examples of unskilled, light jobs existing in the State of Ohio and the United States: (1) retail labeler/marker (DOT Number 920.587-014, 7,000 jobs existing in the statewide economy and 210,000 jobs existing in the national economy); and (2) cleaner (DOT Number 323.687-014, 4,000 jobs existing in the statewide economy and 194,000 existing (*sic*) in the national economy).

(R. at 37.)

Because the hypothetical question posed by the ALJ asked the VE to consider someone who could *frequently* climb ramps and stairs, balance, kneel, crouch, and crawl instead of someone who could only perform such tasks occasionally, Plaintiff's limitations were not fully and accurately conveyed to the vocational expert in the hypothetical.  (R. at 28−29, 76.)  Thus, the ALJ committed error in relying upon the vocational expert's testimony to determine that

Plaintiff could do other work.  *Ealy*, 594 F.3d at 517.

Nevertheless, administrative agency decisions are subject to harmless error review.
*See Rabbers*, 582 F.3d at 654; *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.
2001). *See also Irvin v. Soc. Sec. Admin.*, 573 Fed.App'x 498, 502 (6th Cir. 2014); *Potter v.
Comm'r of Soc. Sec.*, 223 F. App'x 458, 463 (6th Cir. 2007).  Accordingly, a reviewing court
should not remand for further administrative proceedings unless the claimant has been prejudiced
on the merits or deprived of substantial rights because of an alleged error.  *Rabbers*, 582 F.3d at
654.  Furthermore, the Sixth Circuit has suggested that "where remand would be an idle and
useless formality, courts are not required to convert judicial review of agency action into a ping-
pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (internal
quotations omitted).

The VE identified two jobs that Plaintiff could perform based on the ALJ's hypothetical:
retail labeler/marker and cleaner, and the ALJ identified those two jobs in his written step-five
finding.  (R. at 36.)  The Commissioner correctly points out that the DOT listings for a retail
labeler/marker indicate that this position only requires occasional climbing of ramps and stairs,
and that balancing, kneeling, crouching, and crawling are "not present."  *See* United States
Department of Labor, Dict. of Occup. Titles, § 920.587-014, 1991 WL 687915.  Similarly, the
DOT listing for a cleaner indicates that this position only occasionally requires kneeling, and that
climbing ramps and stairs, balancing, crouching, and crawling are "not present."  *See* United
States Department of Labor, Dict. of Occup. Titles, § 323.687-014, 1991 WL 672783.
Accordingly, the limitation at issue, occasionally performing these tasks instead of frequently
performing these tasks, was not an excluding limitation for either of these occupations.  Had the
ALJ correctly included this limitation in the hypothetical he posed to the VE, the VE's answer

21

regarding these two occupations would have remained the same.  Moreover, the VE testified that these jobs existed in significant numbers in the local and national economies.  *See Porche v. Colvin*, No. 5:14-423-DCR, 2015 WL 5162500, at *8 (E.D. Ky. Sept. 1, 2015) (finding ALJ's failure to include limitation in hypothetical question posed to vocational expert harmless error because limitations would not have precluded a claimant from performing occupations identified by vocational expert); *Bennett v. Colvin*, No. 6:14-163-DCR, 2015 WL 574631, at *6–7 (E.D. Ky. Feb. 11, 2015) (same).

For these reasons, the Court concludes that substantial evidence supports the ALJ's step-five determination and that Plaintiff did not suffer any harm in connection with the inaccurate hypothetical question.  The Court finds that the Plaintiff was not prejudiced on the merits or deprived of a substantial right because of the alleged error by the ALJ.  Accordingly, the Court finds that the ALJ did not commit reversible error at step five of the analysis.  *See Porche*, 2015 WL 5162500, at *8; *Bennett*, 2015 WL 574631, at *6–7.

## IV.    CONCLUSION

From a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  The Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's determination.  This case is **DISMISSED**.  The Clerk is directed to enter Judgment for the Commissioner.

**IT IS SO ORDERED.**

   s/ Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  September 9, 2016**

22